DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant April R. ("Mother") has appealed from the judgment of the Summit County Court of Common Pleas, Juvenile Division, which awarded legal custody of her daughter, R.R., to Benjamin and Beth W. (collectively, the "Foster Parents"). This Court affirms.
 I {¶ 2} R.R. was born on November 4, 2004. At the time, Mother was in prison for convictions related to theft and forgery. Shortly after giving birth, Mother was accused of attempting to quiet R.R.'s crying with a pillow. As a result, Summit County Children's Services Board ("CSB") sought emergency *Page 2 
temporary custody of the child. Following the filing of CSB's complaint, the parties agreed that R.R. would be adjudicated a dependent child. At fourteen days old, the child was placed in the Foster Parents' home and has remained there during the pendency of these proceedings.
 {¶ 3} During this matter, CSB sought and received several six-month extensions of its temporary custody. In its motions, CSB asserted that Mother needed more time to comply with her case plan and an extension was necessary to facilitate reunification. For her part, Mother continued to attempt to comply with her case plan. Upon her release from prison, she tried to find stable employment and stable housing. After numerous failed efforts, Mother was able to secure seemingly stable employment and housing. Mother also completed parenting classes and regularly attended counseling with Robert Bell for her psychological disorders. During these proceedings, Mother also became pregnant with her second child. She believed that the father of this second child was a man named Tony Adams.
 {¶ 4} As a result of Mother's progress, CSB filed a motion requesting that legal custody be returned to Mother. In response, Foster Parents filed a motion requesting that they be awarded legal custody. After hearing testimony from all of the interested parties, the trial court found that it was in R.R.'s best interest to award the Foster Parents legal custody. Mother has timely appealed the trial court's judgment, raising three assignments of error for review.
 Court of Appeals of Ohio, Ninth Judicial District *Page 3 
 II Assignment of Error Number One "THE COURT'S DECISION DENYING MOTHER'S MOTION FOR LEGAL CUSTODY SUBSEQUENT TO A SUNSET DISPOSITIONAL HEARING IS CONTRARY TO LAW AND UNSUPPORTED BY THE EVIDENCE PRESENTED."
 {¶ 5} In her first assignment of error, Mother has argued that the trial court erroneously awarded legal custody to the Foster Parents. This Court disagrees.
 {¶ 6} Initially, we note that Mother has raised numerous, distinct errors in this assignment of error in violation of Loc.R. 7(B)(7). Despite this error, we address each of Mother's claims separately.
Admission of Hearsay Evidence {¶ 7} Mother has argued that the trial court erred in permitting the introduction of hearsay evidence at the dispositional hearing. We disagree.
 {¶ 8} Juv.R. 34(B)(2) allows the use of hearsay evidence at most dispositional hearings and states in relevant part that "the court may admit evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence[.]" By its plain language, the rule acknowledges the requirements of Juv.R. 34(I) that the Rules of Evidence "shall apply" in hearings on motions for permanent custody.
 {¶ 9} On appeal, Mother has argued that the trial court erroneously proceeded under R.C. 2151.353. Mother has asserted that R.C. 2151.35(F) permits the admission of hearsay evidence in a proceeding under R.C.2151.353 *Page 4 
and that there is no equivalent statute which would permit hearsay in a proceeding under R.C. 2151.415. Mother, however, ignores the effect of Juv.R. 34(B)(2). Moreover, the Ohio Supreme Court has found that R.C.2151.35(F), which purports to admit hearsay at dispositional hearings, is invalid. Specifically, the Court held as follows:
 "The statute is either one of two things-it is meaningless because the matter is already covered in Article VIII of the Evidence Rules, or it is unconstitutional as it attempts to change (enlarge) the Evidence Rules as promulgated by this court. * * *
 "Given the foregoing, R.C. 2151.35(F) is inconsistent with Article VIII of the Ohio Rules of Evidence and, as such, has no force or effect." In re Coy (1993), 67 Ohio St.3d 215, 219.
However, in its ruling, the Court noted that the general hearsay rule could be altered constitutionally by "other rules prescribed by the Supreme Court of Ohio." Id., quoting Evid.R. 802. Juv.R. 34(B)(2), therefore, serves to properly alter the general rule regarding hearsay. As a result, the trial court did not err in permitting the introduction of hearsay evidence at the dispositional hearing.
Best Interests of R.R. {¶ 10} Mother also has argued that the trial court erred in determining that it was in R.R.'s best interest to grant legal custody to the Foster Parents. We disagree.
 {¶ 11} The decision to grant or deny a motion for legal custody is within the sound discretion of the juvenile court. In re M.S., 9th Dist. No. 22158, 2005-Ohio-10, at ¶ 11. This Court will not reverse the decision of the juvenile court *Page 5 
absent an abuse of discretion. Id. An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. Furthermore, when applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621.
 {¶ 12} Although the statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, this Court has previously held that the trial court must base such a decision on the best interest of the child. In re S.J., 9th Dist. No. 23199,2006-Ohio-6381, at ¶ 32, citing In re N.P., 9th Dist. No. 21707,2004-Ohio-110, at ¶ 23. Consequently, "[i]n legal custody cases, trial courts should consider all factors relevant to the best interest of the child." In re S.J. at ¶ 34. We have also noted that the factors contained in R.C. 2151.41.4(D) may provide guidance to the trial court in making an award of legal custody. Id. at ¶ 32. Those factors include:
 "The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or *Page 6 
more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
 "The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.41.4(D)(1-4).
 {¶ 13} Initially, we note that the Ohio Supreme Court has distinguished legal custody from permanent custody, holding that "[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." In reC.R., 108 Ohio St.3d 369, 2006-Ohio-1191, at paragraph one of the syllabus. The Constitutions of both the United States and the state of Ohio afford parents a fundamental right to custody of their children.In re Hockstok, 98 Ohio St.3d 238, 2002-Ohio-7208, at ¶ 16, citingSantosky v. Kramer (1982), 455 U.S. 745, 753. Therefore, while the trial court must focus on the best interest of the child, it cannot entirely ignore the precatory language found in the Revised Code with respect to case planning in these matters:
 "In the agency's development of a case plan and the court's review of the case plan, the child's health and safety shall be the paramount concern. The agency and the court shall be guided by the following general priorities:
 "A child who is residing with or can be placed with the child's parents within a reasonable time should remain in their legal custody even if an order of protective supervision is required for a reasonable period of time." R.C. 2151.412(G)(1).
With these principles in mind, we review the trial court's decision awarding legal custody to the Foster Parents. *Page 7 
 {¶ 14} We first address the contentions of Mother and CSB that the trial court improperly emphasized the wealth of the Foster Parents. The trial court's judgment entry does not reflect such an emphasis. Moreover, a full reading of the record and the trial court's decision reflects that the trial court meticulously considered all of the evidence presented to it before determining R.R.'s best interests. The trial court placed no special emphasis on wealth and its decision reveals that many other factors contributed to its ultimate award of legal custody to the Foster Parents. Accordingly, we proceed to review that decision.
 {¶ 15} Upon a thorough review of the trial court's judgment, we cannot say that the lower court abused its discretion in finding that it was in R.R.'s best interest to award legal custody to the Foster Parents. While unquestionably a difficult decision based upon the evidence presented, this Court cannot say that the trial court was unreasonable, arbitrary, or unconscionable in reaching its decision.
 {¶ 16} This case offers a somewhat awkward procedural history. Mother gave birth to R.R. while she was incarcerated for forgery and theft. Mother was placed in a special ward of the prison to facilitate caring for the child. Shortly after being placed in that ward, another inmate reported that Mother had attempted to quiet R.R.'s crying by placing a pillow over the child. Based upon that allegation, CSB was granted emergency temporary custody of R.R. on November 18, 2004 — fourteen days after she was born. Upon the grant of temporary custody to CSB, R.R. began living with the Foster Parents. *Page 8 
 {¶ 17} CSB filed Mother's case plan in early December 2004 with its ultimate goal being the reunification of R.R. and Mother. CSB then requested multiple six-month extensions under the theory that it would provide Mother with more time to meet the objectives of her case plan. In September 2006, CSB moved for permanent custody of R.R. Thereafter, the record is unclear regarding whether this motion was dismissed by the trial court or withdrawn by CSB. However, on January 17, 2007, CSB filed a motion requesting that legal custody be given to Mother. In turn, Foster Parents filed their motion for legal custody.
 {¶ 18} The trial court heard testimony from numerous witnesses, many of whom held differing views regarding who should receive legal custody of R.R. For ease, we summarize their testimony below.
 {¶ 19} Both Beth and Ben W. testified in a similar manner and supplied the following facts. The Foster Parents indicated that R.R. had become very attached to them. R.R. referred to Beth as "mommy" and referred to Ben as "daddy." The Foster Parents provided a stable home life to R.R. They routinely took R.R. to visit with her Foster Grandparents, nearly on a weekly basis. They invited roughly 150 close friends and families and to R.R.'s first birthday to show how much they cared for her and to demonstrate the wide network of relatives that would help provide stability in R.R.'s life. Beth went as far as to write a letter to Mother encouraging Mother to let the Foster Parents have custody of R.R. In that letter, Beth explained that R.R. recognized Mother, but that R.R. also recognized Beth *Page 9 
and Ben as her "psychological parents." Moreover, Beth promised that she would do everything in her power to ensure that Mother remained a large part of R.R.'s life if legal custody was granted to the Foster Parents.
 {¶ 20} The trial court also heard the testimony of social service aide Roma Niles. Niles testified that R.R. seemed happy during her supervised visits with Mother. Niles testified that it appeared that Mother was attentive to R.R.'s needs, that R.R. referred to Mother as "mommy," and that the two seemed to bond during their visits.
 {¶ 21} During cross-examination, Niles admitted that she had noticed dangerous items in Mother's house on a few occasions that were within R.R.'s reach. Niles added, however, that Mother was always quick to remedy any deficiency when it was pointed out to her.
 {¶ 22} Catherine Klie, the executive director of St. Joseph Parenting and Visitation Center, also testified. Klie's testimony established the following. Mother completed all 24 of the parenting classes offered by her institution, completed the classes in an appropriate amount of time, repeated several classes on her own volition, and even completed an extra class that the center was contemplating adding to its curriculum. Mother never posed a problem during the classes and always seemed eager to learn.
 {¶ 23} In addition, Klie testified that she personally observed a two-hour visit between Mother and R.R. shortly before the hearing and noticed the *Page 10 
following. Mother was very involved with R.R. during the visit. Klie noted that despite being fairly well along in her current pregnancy, Mother made efforts to get on the floor and interact with R.R. Moreover, without prompting, Mother requested a drink for R.R., believing that R.R. may be thirsty. Klie indicated that all of Mother's action during the visit demonstrated that she was employing the parenting techniques taught by the center's classes.
 {¶ 24} Jay DiPaolo, a supervisor in the ongoing case department of CSB, also offered testimony in the trial court. DiPaolo testified as follows. DiPaolo had direct contact with Mother on rare occasions, but he consistently spoke with the caseworker assigned to Mother and R.R. DiPaolo explained the specifics of Mother's case plan which had remained substantially the same throughout the proceedings. The case plan included numerous objectives. The first objective related to Mother's criminal history and required her to fully comply with the law. The second objective required Mother to obtain adequate income and housing to provide for R.R. The third objective required Mother to undergo a psychological assessment due to the allegations that she attempted to quiet R.R. with a pillow. The fourth objective required Mother to obtain some sense of permanency in her residence and to successfully complete parenting classes. Finally, the case plan called for establishing paternity.
 {¶ 25} DiPaolo testified that it was CSB's position that Mother had successfully completed the objectives in her case plan. At the time of the hearing, *Page 11 
Mother had maintained the same job for more than six months and had rented the same apartment for roughly the same length of time. In addition, Mother had not committed any crime since her release from prison, had completed the St. Joseph parenting classes, had undergone a psychological assessment, and had undergone continuous counseling since that assessment. By the time of this hearing, Mother had identified three different males as potential fathers of R.R., but DNA testing had excluded each of the three. As such, CSB was no longer pursuing paternity. DiPaolo concluded that it was CSB's position and goal that Mother be reunited with R.R.
 {¶ 26} During cross-examination, DiPaolo admitted that he believed that the numerous six-month extensions requested by CSB resulted from Mother's inability to comply with the case plan in a timely manner. Mother held numerous jobs for short periods of time. From one position at a fast food restaurant, she was terminated after three months for not showing up to work and failing to call to inform her employer that she was sick. From a second job at another restaurant, she quit after two months, alleging that a customer who had given her $100 was stalking her. Mother then spent one month boxing light bulbs before she was fired for leaving work without her supervisor's permission. Mother next worked for a telemarketing service for four months. Mother quit the job under the belief that she was going to be fired. Mother was then unemployed for roughly four months *Page 12 
before gaining employment at McDonald's in March 2006. Mother has maintained that employment since that time.
 {¶ 27} DiPaolo was also questioned about Mother's residency during this time period. DiPaolo testified that Mother remained transient for a period of time after her release from prison. She lived with numerous friends and acquaintances until she established her current residence on her own. DiPaolo noted that these actions also contributed to extending CSB's temporary custody.
 {¶ 28} Finally, DiPaolo was questioned about whether he believed that it was in R.R.'s best interest to be returned to Mother. DiPaolo responded that it was CSB's position that R.R. could be safely reunited with Mother.
 {¶ 29} The trial court also considered the testimony of Mother's counselor, Robert Bell, an independently licensed social worker. Through his sessions with Mother, Bell diagnosed her with two conditions — a primary condition of antisocial disorder and a secondary condition of adjustment disorder. Bell also noted that Mother was clinically depressed when their sessions began. Bell testified, however, that Mother had made great strides in alleviating the symptoms of these disorders. When Mother first began with Bell, she often placed the needs of others, especially men with criminal histories, before her own needs. Bell noted that when he began seeing Mother, she was "giving more attention to her boyfriends that her own child, even though her child was not with her." Bell stated that as their sessions progressed, Mother became increasingly focused and *Page 13 
learned that her daughter's needs had to take priority in her life. Bell noted that Mother went as far as to end a relationship with Tony Adams in order to facilitate the return of R.R. to her custody. Bell also observed two visits between Mother and R.R. During these visits, Bell witnessed that Mother was consistently attentive to R.R.'s needs and forward thinking, i.e., Mother anticipated possible safety issues with the location of the visit and took precautions to insulate R.R. from those dangers. For example, Mother directed R.R. away from a large plant in Bell's office that could have hurt her if she played near it.
 {¶ 30} During cross-examination, Bell admitted that Mother's antisocial disorder would never be "cured." She would always have the disorder, but that through maturation and consistent counseling, the symptoms could become nearly nonexistent. Bell also explained that Mother is not a sociopath. Rather, Mother's antisocial disorder was based upon the general traits of such a disorder, i.e., "a pattern of disregard for and violation of the rights of others." Bell testified that Mother initially presented with these traits based on her history of theft offenses and her use of "sex to manipulate men."
 {¶ 31} Under cross-examination, Bell admitted that Mother's pattern of poor choices in her relationships with men continued. Twice during her counseling sessions, Mother was assaulted by a man she was dating named Terrence Abrams. Only one month after this second assault, Bell recommended that R.R. be returned to Mother because her decision making had improved. Bell *Page 14 
admitted his error in this regard and stated that Mother had him "fooled at that point." Bell also conceded that Mother had relationships with four different men during their counseling sessions and that none of these relationships exhibited positive decision making.
 {¶ 32} Bell also testified that he believed that Mother's boyfriend later in her counseling, Tony Adams, was a "good influence" on Mother. At the time, Bell was apparently unaware that Adams had multiple prior convictions, including convictions for voyeurism and domestic violence. Consequently, Bell was somewhat troubled to learn during his testimony that Mother waited for several months after learning of Adams' criminal history before breaking off their relationship. Bell explained, however, that the ultimate ending of the relationship demonstrated Mother's movement toward placing R.R. as her priority. Additionally, Bell was troubled to learn that Mother had maintained a friendship with another man, Jeremy Jackson, for several months after Jackson had assaulted Mother.
 {¶ 33} The trial court also heard directly from Mother. During her testimony, Mother explained how difficult it had been for her to find stable housing and employment after leaving prison. She explained that she had been in numerous poor relationships with men in the past, but that she was moving forward in an attempt to create a better life for her daughter. Mother, however, never explained in detail to her counselor, Bell, the nature of her relationships. *Page 15 
She did not explain Adams' criminal history, nor did she inform Bell that she remained friends with some of the men who had abused her in the past. While Mother was proud of her completion of the parenting classes and testified that she had implemented many of the things she learned in those classes, as with her sessions with Bell, it is possible that Mother is simply stating what she knows will assist her case for legal custody. For example, Mother testified that she now understands that her daughter and her pending second child have to be the priority in her life. At the same time, however, Mother expressed a desire to have Adams, a man who abused her and a man convicted of voyeurism, actively involved in raising her second child.
 {¶ 34} During Mother's cross-examination, several concerns arose. First, Mother admitted that her monthly income did not meet her monthly expenses. She routinely fell behind on utility payments and paid off mandatory bills first while letting other bills accrue. Mother also admitted that Adams continued to pay some of her bills. When questioned about Adams, Mother indicated that she was not aware of his criminal history until CSB brought it to her attention. Upon verifying this history, which included two convictions for voyeurism and a domestic violence conviction, Mother ended their relationship. When further questioned, however, Mother admitted that Adams was the father of her unborn child and that she hoped that Adams would be a part of that child's life. With respect to this second child, Mother also testified that she was unaware of how it would impact *Page 16 
her job stability. She did not know what type of leave her job would permit and how the second child would affect her expenses.
 {¶ 35} Finally, the trial court heard from Seifert, R.R.'s GAL. Seifert adamantly testified that the Foster Parents should be granted legal custody of R.R. During her testimony, Seifert recounted Mother's dependence on men, predominantly men with criminal histories which included domestic violence. Seifert noted that even through the date of the hearing, Mother was financially dependent on Adams and remained connected to him despite his criminal history. Seifert also testified that R.R. behaved very differently when in the custody of the Foster Parents as opposed to when R.R. was visiting with Mother. With the Foster Parents, R.R. appeared outgoing, animated, and always very loving. When Seifert observed R.R. with Mother, she seemed more withdrawn. Seifert also testified that she had never seen healthy food in Mother's apartment and that Mother spoke of feeding R.R. food that was inappropriate for a two-year old. Specifically, Seifert stated that Mother had informed her that she fed R.R. popcorn and often fed her free food that Mother received working at McDonald's. Seifert also testified that Mother once fed R.R. an entire bowl of green olives as a snack. Seifert further testified that Mother never developed a routine with R.R. Mother herself admitted that she let R.R. do whatever she wanted. For example, if R.R. did not want to sleep, Mother let her stay up or skip a nap. *Page 17 
 {¶ 36} In contrast, Seifert testified that the Foster Parents provided appropriate food for R.R. In addition, Seifert testified that R.R. was most at ease and happy when she was on a consistent schedule. The Foster Parents provided this schedule. R.R.'s naps were taken, her meals were planned, and her bed time was scheduled at the same time each day. In addition, the Foster Parents always included time to read to R.R. during the day and time for her to play and explore.
 {¶ 37} Finally, Seifert testified that Mother had expressed that she would not include the Foster Parents in R.R.'s life if she received legal custody. Seifert believed that such a break with the caregivers R.R. had known since she was fourteen days old would be vastly detrimental and could affect R.R. mentally into her early adolescence. Moreover, Seifert noted that a grant of legal custody to the Foster Parents would still provide Mother with visitation rights and indicated that the Foster Parents had always desired to include Mother in R.R.'s life.
 {¶ 38} Based upon the above testimony, this Court cannot say that the trial court's decision was erroneous. Mother has clearly made positive progress in her life and in her ability to care for R.R. However, Mother has continued to make unwise and potentially dangerous decisions. Mother is still somewhat dependent on Adams financially and has expressed a desire that he be involved in her life, despite his serious criminal history. Further, it does not appear that Mother has been able to successfully meet R.R.'s needs. R.R. was fed inappropriate snacks while in Mother's care, and Mother rarely had the appropriate food in her house to *Page 18 
feed R.R. In addition, there is a great deal of uncertainty regarding Mother's current job and her current residence. Mother admitted that she did not know what effect her current pregnancy and the subsequent birth of her second child would have on her. She did not know whether it would affect her job or whether the expense of the second child would affect her living situation.
 {¶ 39} On the other hand, no concerns were raised with respect to the Foster Parents. Rather, they acted as the system intended. As foster parents, they provided a loving and nurturing home to R.R. and facilitated visits between Mother and R.R. They placed R.R. in a highly regarded preschool where R.R. has indisputedly demonstrated a high aptitude for learning.
 {¶ 40} Though Mother has made progress, there is still much uncertainty in her life and there remain matters of serious concern regarding her decision making. Throughout these proceedings, Mother has routinely entered abusive relationships and dated men who present serious dangers to a young girl like R.R. As such, we cannot find error in the trial court's determination that it is in R.R.'s best interest to award legal custody to the Foster Parents. Mother's first assignment of error is overruled.
Assignment of Error Number Two
 "THE COURT ERRED TO THE DETRIMENT OF MOTHER WHEN IT FAILED TO PLACE R.R. IN HER CUSTODY *Page 19 
SUBSEQUENT TO SUMMIT COUNTY CHILDREN SERVICES BOARD'S FAILURE TO UTILIZE REASONABLE EFFORTS TO REUNIFY HER WITH R.R."
 {¶ 41} In her second assignment of error, Mother has argued that CSB failed to utilize reasonable efforts to reunify her with R.R. We disagree.
 {¶ 42} R.C. 2151.419 requires that CSB put forth reasonable efforts toward reunification at several stages of the proceedings. In her brief, Mother has failed to identify any instance in which CSB failed to make a reasonable effort. Mother simply states in a conclusory fashion that CSB failed to make reasonable efforts. "If an argument exists that can support [Mother's contentions], it is not this court's duty to root it out." Cardone v. Cardone (May 6, 1998), 9th Dist. Nos. 18349 18673, at *8.
 {¶ 43} Moreover, the record reflects that CSB made substantial efforts to reunite Mother with R.R. CSB sought numerous extensions to permit Mother to comply with her case plan. Caseworkers provided Mother with transportation to help her acquire the items she needed to properly care for R.R. CSB also filed its motion with the trial court requesting that legal custody be awarded to Mother. This Court, therefore, cannot conclude that CSB failed to make reasonable efforts to reunite Mother with R.R. Mother's second assignment of error is overruled.
 Assignment of Error Number Three "THE COURT ERRED TO THE DETRIMENT OF MOTHER WHEN IT FAILED TO PLACE THE CHILD IN HER CUSTODY *Page 20 
AT A SUNSET DISPOSITIONAL HEARING THUS DEPRIVING HER OF THE FUNDAMENTAL LIBERTY INTEREST OF REARING HER CHILD WITHOUT PROVIDING HER SUBSTANTIVE DUE PROCESS PROTECTION AND DEPRIVING HER OF EQUAL PROTECTION UNDER THE LAW IN VIOLATION OF THE OHIO AND UNITED STATES CONSTITUTIONS."
 {¶ 44} In her final assignment of error, Mother has argued that the procedure used by the trial court and Ohio's statutory scheme violate her constitutional rights. This Court disagrees.
Substantive Due Process {¶ 45} Mother has first argued that her substantive due process rights were violated by the trial court. Mother has premised this argument upon the errors she alleged in her first two assignments of error. Specifically, Mother has argued that her rights were violated by the trial court's failure to use the proper standard of proof, to require CSB to make reasonable efforts toward reunification, to properly allocate the burden of proof, to strike inadmissible hearsay evidence, and to utilize the correct statute for disposition. This Court found above that the trial court properly admitted hearsay evidence, properly found that it was in R.R.'s best interest that Foster Parents be awarded legal custody, and properly found that CSB used to reasonable efforts to reunite Mother with R.R. Accordingly, Mother's argument that her due process rights were violated must fail as it is premised upon a finding that the trial court erred in these respects.
Equal Protection *Page 21 {¶ 46} Mother has also argued that her equal protection rights were violated by Ohio's statutory scheme. Mother has asserted that since Ohio treats permanent custody proceedings differently than legal custody proceedings, her due process rights have been violated. We disagree.
 {¶ 47} The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution states that no state shall deny to any person the equal protection of the laws. It prevents a state from treating people differently under its laws on an arbitrary basis. Harper v.Virginia State Bd. of Elections (1966), 383 U.S. 663, 681. An equal protection claim arises, therefore, only in the context of an unconstitutional classification made by a state, i.e., when similarly situated individuals are treated differently. See Conley v. Shearer
(1992), 64 Ohio St.3d 284, 288-289. Accordingly, a law that operates identically on all people under like circumstances will not give rise to an equal protection violation. Id. at 290.
 {¶ 48} Mother has not identified any similarly situated persons who are treated differently under Ohio's law. In her attempt to do so, Mother has asserted that she is similarly situated to any individual involved in a custody proceeding, regardless of whether that proceeding seeks legal custody or permanent custody. We cannot agree with her analysis.
 {¶ 49} Ohio courts have consistently distinguished between legal and permanent custody proceedings. Legal custody is "a legal status that vests in the custodian the right to have physical care and control of the child and to determine *Page 22 
where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C.2151.011(B)(19). Residual parental rights, privileges, and responsibilities means "those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support." R.C. 2151.011(B)(46). In contrast, R.C. 2151.011(B)(30) defines "permanent custody" as "a legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, including all residual rights and obligations." "The important distinction is that an award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." In re C.R.,108 Ohio St.3d 369, 2006-Ohio-1191, at ¶ 17.
 {¶ 50} Accordingly, individuals faced with permanent custody proceedings are not similarly situated to those faced with legal custody proceedings. The residual parental rights which survive a legal custody award provide the basis for this distinction. During this appeal, Mother has argued that this is an irrelevant *Page 23 
distinction. Mother has argued that legal custody is such a harsh remedy that it should be treated the same as permanent custody. We decline to make such an analogy. Following an award of legal custody, Mother still has the right to visit with R.R., to choose her religious affiliation, and still has the duty to support her child. While it may be difficult to regain custody of R.R., that opportunity has not been foreclosed as it would be in a permanent custody proceeding. Mother, therefore, has failed to establish a class of similarly situated persons subject to disparate treatment. Rather, she has established that persons situated differently are treated differently under Ohio's statutory scheme. Mother's equal protection claim lacks merit.
 {¶ 51} Mother's third assignment of error is overruled.
 III {¶ 52} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed. The Court finds that there were reasonable grounds for this appeal. We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into *Page 24 
execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
SLABY, P. J. Concurs