[Cite as *In re J.D.*, 2022-Ohio-2677.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE J.D., ET AL.                    :

Minor Children                       :                    No. 111039

                                     :

[Appeal by Mother, L.C.]             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:**   August 4, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-18-910336, AD-18-910337, AD-18-910338,
AD-18-910339, AD-18-910340, and AD-18-910341

---

### *Appearances:*

John H. Lawson, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

ANITA LASTER MAYS, P.J.:

{¶ 1}   Appellant L.C. ("Mother") appeals the juvenile court's termination of

her parental rights of her minor children, J.D. (who is no longer a minor child), T.H.,

MI.D., MA.D., MK.C., and MR.C. ("the children") and the permanent award of custody of T.H. and MK.C. to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). We affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} On August 19, 2018, MK.C., who was seven years old at the time, was found by the police walking down the street alone. The police took him home and found the other five children home without adult supervision. The police observed that the home had broken windows; had holes in the walls; was filled with trash throughout the house; and lacked beds, furniture, and food. The police removed the children from the home.

{¶ 3} On August 20, 2018, CCDCFS filed a complaint against Mother alleging that Mother was neglecting her six children and requested temporary custody. CCDCFS also filed a motion for predispositional temporary custody. On that same day, the magistrate granted predispositional custody to CCDCFS. History of this family reveals that J.D., the oldest child, was committed to CCDCFS's protective supervision in 2004, after he was adjudged delinquent, and currently paternity has not been established. The father of T.H. failed to establish paternity and is incarcerated until 2037. The father of MI.D. and MA.D. also failed to establish paternity. At the time of these proceedings, Mother was married and living with the father ("Father") of MK.C. and MR.C.

{¶ 4} On August 22, 2018, Pinkie Clark, the guardian ad litem ("the GAL") was appointed for the children. CCDCFS filed a case plan on September 13, 2018, which indicated that in order for reunification to take place between Mother and the children, Mother and Father needed to reduce the risks and safety issues in the home; provide a three-day supply of food in the home; use community resources such as food stamps, food pantries, and cash assistance; provide a clean home; provide adequate supervision when the children are left home; attend and complete a parenting skills program; allow the agency access to the home once per month; follow through with all agency referrals; complete drug assessments; participate in a service suggested by the assessment; remain sober; participate in random drug screens; and have weekly visitations with the children.

{¶ 5} On October 25, 2018, CCDCFS amended their complaint to include that the house and supervision of the children was substandard. Mother acknowledged that both were below standard, and none of the fathers of the children were present at the hearing. On November 29, 2018, Mother consented to CCDCFS receiving temporary custody of the children, and all six of the children were placed in CCDCFS temporary custody.

{¶ 6} CCDCFS requested and received two six-month extensions after temporary custody was issued in order to give Mother time to rectify her issues. Those extensions were granted on August 12, 2019, and February 27, 2020. On July 28, 2020, CCDCFS filed motions to modify the order of temporary custody to

permanent custody of the two children, T.H. and MK.C. The other four children were placed in the custody with other family members. A trial was scheduled for November 4, 2020; however, Mother filed a motion to continue the trial date. The trial court granted Mother's motion, and the trial was rescheduled for March 30, 2021. CCDCFS filed a motion to continue the March 30th trial date because their counsel had an emergency. The trial court granted the motion and rescheduled the trial for June 15, 2021.

{¶ 7} Mother filed a motion to continue the trial date due to a medical emergency, and the trial court granted the motion but indicated that it would be the final continuance. The trial was scheduled and held on September 27, 2021. The trial court granted custody to CCDCFS for the children as follows: legal custody of J.D. was granted to his paternal aunt; permanent custody of T.H. and MK.C. was granted to CCDCFS; and legal custody of MI.D., MA.D., and MR.C. was granted to the maternal grandparents.

{¶ 8} Mother filed an appeal assigning three errors for our review:

I. The trial court erred and abused its discretion by scheduling the trial nearly 400 days after the appellee's motion for permanent custody was filed in violation of R.C. 2151.414(A)(2);

II. The trial court erred and abused its discretion by awarding permanent custody of T.H. and MK.C. to appellee against the manifest weight of the evidence; and

III. The trial court erred in issuing legal custody order regarding J.D., MI.D., MA.D., and MR.C.

## II. Delay of Trial

{¶ 9} In Mother's first assignment of error, she argues that the trial court abused its discretion by violating the 120-day deadline to hold a permanent custody hearing pursuant to R.C. 2151.414(A)(2), which states in part:

> The court shall hold the hearing scheduled pursuant to division (A)(1) of this section not later than one hundred twenty days after the agency files the motion for permanent custody, except that, for good cause shown, the court may continue the hearing for a reasonable period of time beyond the one-hundred-twenty-day deadline. The court shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion.
>
> The failure of the court to comply with the time periods set forth in division (A)(2) of this section does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court.

R.C. 2151.414(A)(2).

{¶ 10} An appellate court may find that a trial court abused its discretion only if it finds that the decision of the trial court was unreasonable, arbitrary, or unconscionable. *In re Z.J.*, 8th Dist. Cuyahoga No. 108834, 2020-Ohio-383, ¶ 15, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 11} The motion for permanent custody was filed on July 28, 2020, and the hearing was held on September 27, 2021, more than 120 days from when CCDCFS file for permanent custody. Trial was initially schedule for November 18, 2020, within 120 days, but Mother filed a motion to continue the trial date, which was rescheduled for January 8, 2021. On that day, an attorney conference was held

and the trial date was rescheduled to March 30, 2021. Counsel for CCDCFS filed a motion to continue, and the trial court rescheduled the trial again for June 15, 2021. Mother filed a motion to continue because she was unable to attend the trial on that date, and the trial court rescheduled the trial for September 27, 2021. Each continuance was for good cause shown.

{¶ 12} Although the trial was held more than 120 days from when the motion for permanent custody was filed, and more than 200 days after continuances, Mother was responsible for the trial being delayed twice and CCDCFS once. "Because the time provisions of R.C. 2151.414(A)(2) are directory and not mandatory, the Ohio Supreme Court has held that a litigant must seek a writ of procedendo against the juvenile court if it does not comply with these time limits." *In re K.H.*, 5th Dist. Licking No. 13-CA-100, 2014-Ohio-1594, ¶ 14, citing *In re Davis*, 84 Ohio St.3d 520, 523-524, 705 N.E.2d 1219 (1999). "If a party does not seek such a writ, he is stopped from arguing on appeal that delay by the juvenile court violated his due process rights." *Id.* *See In re M.G.*, 5th Dist. Richland No. 16CA18, 2016-Ohio-5256, ¶ 37. *See also In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 8 ("[T]he failure to meet the 200-day time frame contained in R.C. 2151.414(A)(2) does not provide a basis for attacking the validity of the judgment.").

{¶ 13} Because Mother was responsible for the trial being delayed twice, good cause has been shown as to why the trial court scheduled the trial beyond the statutory limits.   Therefore, Mother's first assignment of error is overruled.

## III.   Permanent Custody

{¶ 14} In Mother's second assignment of error, she contends that the trial court erred by awarding permanent custody of T.H. and MK.C. to CCDCFS against the manifest weight of the evidence.

{¶ 15} To terminate parental rights and grant permanent custody to a county agency, the record must demonstrate by clear and convincing evidence the following:    (1) the existence of one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) permanent custody is in the best interest of the child.   *In re S.H.*, 8th Dist. Cuyahoga Nos. 97992, 97993, and 97994, 2012-Ohio-4064, ¶ 27.   "'Clear and convincing evidence'" is that quantum of evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be established."   *In re Y.V.*, 8th Dist. Cuyahoga No. 96061, 2011-Ohio-2409, ¶ 13, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 16} When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze the following factors:   (1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and

whether such a placement can be achieved without permanent custody; and, (5) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply.

{¶ 17} Also,

> [a] juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence."

*In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 18} The "best interest determination" focuses on the child, not the parent. R.C. 2151.414(C); *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994). The discretion that the juvenile court enjoys in deciding whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned. *Id.* at 316.

{¶ 19} Thus, we review "a trial court's determination of a child's best interest under R.C. 2151.414(D) for abuse of discretion." *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 52, citing *In re L.O.*, 8th Dist. Cuyahoga No. 101805, 2015-Ohio-1458, ¶ 22. "An abuse of discretion implies that the court's decision was unreasonable, arbitrary or unconscionable." *Id.*, citing *Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140.

**A.    Children's Interview**

{¶ 20} During the proceeding to determine if permanent custody should be awarded to the agency, the trial court requested an interview with three of the children. Two of the children explained to the trial court that they enjoyed living with their current placements and did not wish to return home if Mother and Father were living together. The children also describe the living conditions of the home, while living with Mother and Father, as not having electricity, broken windows, and a lack of beds and furniture.

## B. Trial Testimony

{¶ 21} At trial, Sarah Narine ("Narine"), social worker for CCDCFS, testified that after MK.C. led police to the family home, the home was in deplorable conditions and was unsafe. The police attempted to contact Mother but were unable, so the children were removed from the home and placed in the emergency care of CCDCFS. Narine explained that the goal of CCDCFS was to reunify the children with their parents and a case plan was created for both Mother and Father. Narine testified that the case plan included housing, parenting classes, stable income, and substance abuse treatment.

{¶ 22} Narine testified that Mother's drug tests came back positive for cocaine on August 18, 2020, September 17, 2020, and January 21, 2021; however, Mother received a certificate stating that she completed her Intensive Outpatient Services for substance abuse. Narine also testified that Mother was initially resistant to attending parenting classes because she felt the children's behavioral

issues were due to them being in foster care, not due to her parenting. However, Narine testified that after speaking with the children, the behaviors had been going on quite some time before the children were removed from the home. Mother, however, did attend some parenting classes.

{¶ 23} Narine also testified that the agency had some concerns regarding Father because he was not making any progress with the case plan or addressing the issues on the plan. It was explained to Mother that this was an issue because Father lived in the home and was married to Mother. Mother told CCDCFS that she would get divorced. However a divorce never took place and, according to Father, they were still together and not separated. Father was also aware that he was not addressing his case plan services.

{¶ 24} Narine testified that Mother providing adequate housing was a concern because within two years, Mother and Father had lived in multiple houses. She also explained that Mother seem to understand the objectives of the case plan. Narine explained to Mother and Father that the case plan had to be completed by each parent. Father has tested positive for cocaine multiple times. Father was referred to Recovery Resources to address his substance abuse issues; however, he was not successful in that program because he continued to test positive for cocaine.

{¶ 25} Although Father completed parenting classes, the agency still had concerns about his treatment of the children, specifically his inability to manage his anger around the children. Father also claimed that he was living in a shelter,

separate from Mother. However, Narine testified that there were concerns that Father and Mother were residing in the same home together. During video chats with the children, Father and Mother were together and would show the home they were living in together.

{¶ 26} Narine also testified that when she visited Mother at her home, Father's truck was in the driveway, but Mother told Narine that the truck belonged to someone else. Mother also never provided documentation that they were legally separated or divorced, although she maintained over the years that they were going to get divorced. Narine also stated that she observed Mother and Father in Father's truck together leaving court. Narine also observed Mother and Father together at Starbucks in the same truck she observed in the driveway.

{¶ 27} Narine also explained there were concerns that even though Mother completed the substance abuse treatment plan, Mother was still testing positive for cocaine. Narine testified that Mother's sons were not comfortable with Father in the home. The sons reported that Father forced them to panhandle. Daughters J.D. and T.H. reported being uncomfortable in Father's presence, and there were sexual abuse allegations against Father.

{¶ 28} Narine testified that she made it clear to Mother and Father that Father needed to complete the services in order for reunification to occur. She told Mother and Father that even if they're separated, they both needed to make sure the services were completed.

{¶ 29} Narine also testified that at visitations with Mother, Father, and the children before Covid-19 protocols, Father would get angry with the children and he left two visits early due to his anger. There also was a report that Father may have burned one of the boys during a visit.

{¶ 30} Narine also explained that in regards to T.H. and MK.C., the agency was unable to find familial placement for them, so the agency had to file for permanent custody. As to the other four children, the agency filed for legal custody because they were able to locate familial placement. Narine expressed some concern with MK.C., who was the only child to want to return home with her parents because she has been in more foster homes than any of the other children. According to Narine, Mother and Father always expressed to her that she was coming home, so it created emotional distress for MK.C.

{¶ 31} On cross-examination by Mother and J.D.'s attorneys, Narine testified that Mother obtained a lease without Father's name. Narine also testified that both Mother and Father completed a parenting course but also noted that neither had completed their case plan.

{¶ 32} On redirect examination, Narine testified that the agency requested two six-month extensions of temporary custody to give Mother and Father additional time to complete their case plan. However, when asked why the agency was seeking permanent custody, Narine replied that Mother and Father had not

made sufficient progress with their case plan for the agency to reunify them with the children.

{¶ 33} After Narine, J.D.'s paternal aunt ("aunt") testified. Aunt testified that she was present for a visit between J.D., M.K.C, and Mother. Aunt stated that after the visit, she observed Mother get into a vehicle that was driven by Father. Aunt also testified that J.D. was very concerned with seeing Father pick up Mother because she did not want to see him. Aunt explained that before each visit, J.D. would ask if Father was going to be there because she just wanted to see Mother. The trial court asked aunt if J.D. seemed scared when she saw Mother and Father together, to which aunt replied, "Yes she does." (Tr. 112.)

{¶ 34} Shakeya McKether ("McKether"), a supervisor for CCDCFS, testified that she was assigned to the case of the children. She testified that the children were removed from the care of Mother and Father because they could not provide the basic needs for the children. McKether also testified that Mother lacked appropriate decision-making skills because of the excessive phone calls that the childcare providers would receive from Mother and the fact that Mother kept telling the agency that she was either divorced or separated from Father but provided no evidence to that fact.

{¶ 35} McKether testified that the agency made several referrals for Mother including mental health, substance abuse treatment, and parenting classes. McKether stated that she attempted to facilitate visitation, but Mother was not

consistent during the time McKether was assigned to the case. She also testified that Mother tested positive for cocaine several times. McKether testified that the agency had concerns with Mother and Father's relationship, because the children reported they were fearful of Father and did not want to return home because Father was still living with Mother.

{¶ 36} McKether testified that the agency expressed the children's concerns with Mother. Mother stated that she did not know why the children did not want to be around Father, and she felt as if the agency encouraged the children to falsify these statements. McKether stated to the trial court that the agency had concerns about returning the children to Mother's care because there were multiple reports from the children that they had been homeless and transient. The children also reported to the agency that Father would take Mother's money and they would have to panhandle in order to have money. After panhandling, Father and Mother would take the money from the children but not provide food for them.

{¶ 37} McKether also expressed that T.H. had concerns about Father living in the home with Mother. When T.H. expressed those concerns, Mother stopped communicating with her for weeks. Mother told T.H. that Father was just giving her a ride home from work. However, T.H. stated that Father was in Mother's home around 10:00 or 11:00 at night. T.H. told Mother that Father should not have been in the home at that time of night.

{¶ 38} McKether testified that the children expressed some suffering of physical abuse from Father and that Father treated his biological children differently than his stepchildren. Specifically, the children reported that when Mother would leave the house, Father would allow his biological children to watch TV and roam the home, while the stepchildren had to stay in their rooms.

{¶ 39} McKether also testified that the agency still had significant concerns with reunification between the parents and children because Mother was still married and involved with Father. She stated that there were still barriers in the relationship between Mother and children. Mother would not answer the phone when the children would call but then would call late and excessively to the point that Mother's father had to contact the authorities regarding threatening and harassing voicemails left by Father.

{¶ 40} McKether testified that during Christmas, Mother called the children and told them she bought presents but would not give them to the children until they were returned home. According to McKether, this caused some emotional and mental health issues for the children. McKether spoke to Mother and asked if she could pick the presents up and take them to the kids. Mother told McKether that the presents had to stay in her home until the children returned.

{¶ 41} McKether ended her testimony by stating that the agency was seeking permanent custody of T.H. and MK.C. because there were no family members that would take custody of the girls. McKether also testified that Mother's home is not

emotionally appropriate because the children do not have an appropriate relationship with Mother. There were concerns that Father was staying in the home with Mother and that Mother would constantly involve Father in the virtual visitations.

{¶ 42} Lee Barbee ("Barbee"), extended care worker for CCDCFS and current case manager assigned to the children, testified after McKether. Barbee testified that since receiving the children on his caseload, he has tried to facilitate efforts at reunification between Mother and the children. Specifically, he had been working with Mother to address her drug addiction issues. Barbee explained to the court that Mother continues to test positive for cocaine and tested positive the Thursday before the permanency hearing. He also testified that Mother's home was physically appropriate. Barbee stated that he tried to engage with Father but Father refused.

{¶ 43} Barbee further testified that he facilitated phone calls and visitations between the children and Mother. During those visits, MK.C. exhibited signs of closeness with Mother. Barbee explained that the agency had located another relative that could be available to obtain custody of T.H. and MK.C., who were currently placed together in a foster home.

{¶ 44} After Barbee's testimony, both counsel for Mother and the state rested their case. The trial court asked the GAL to submit her report. In the report, the GAL stated that she did not see any problem with the state asking for

legal custody of J.D., and that J.D. desires not to return to her mother's home. The GAL also stated that she agreed with J.D. and it is not in the best interest of J.D. to return to Mother.

{¶ 45} The GAL also expressed that T.H. did not want to return to Mother and that is not in T.H.'s best interest to be returned to Mother. The GAL continued stating that it was not in the best interest of any of the children to be returned to Mother because Mother has not addressed many of the concerns that were the catalyst for the children being removed from her. She stated that Mother is unable to provide adequate supervision for the children. The children have stated that neither Mother nor Father were able to adequately supervise them, and they believe that the oldest children would be responsible for their care.

{¶ 46} The GAL also stated that MK.C. is the only child that wants to return to Mother, but she was very young during removal and does not remember all of the details that led to the children being removed from the home. The GAL explained that the three boys are living with Mother's father, are doing well in the home and are getting their mental health needs addressed through counseling.

{¶ 47} At the end of the hearing, the trial court awarded permanent custody of T.H. and MK.C. to CCDCFS. The trial court issued journal entries for both children stating:

> The parents have failed to complete the case plan, and the mother's substance abuse is still a safety issue. The child is afraid of [Father], the mother's husband and father of two of the children in this case, and there was testimony that the mother continues to have a

relationship with him. This child has been in custody for three years, and two extensions of temporary custody have already been granted.

Journal entry Nos. 0915150361 and 09151550367 (Oct. 20, 2021).

## C. Legal Analysis

### 1. Clear and Convincing Evidence

{¶ 48} The trial court has authority to grant permanent custody to CCDCFS where, as in this case, a child has been adjudicated as neglected, dependent, or abused.

> When an agency files a permanent custody motion under R.C. 2151.413 after obtaining temporary custody, the guidelines and procedure set forth under R.C. 2151.414 apply. Division (B) of R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court. Pursuant to this division, before a trial court can terminate parental rights and grant permanent custody to a county agency, the court must find by clear and convincing evidence (1) the existence of any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e), and (2) that granting permanent custody to the agency is in the best interest of the child.

*In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 45 (8th Dist.).

{¶ 49} "Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied. * * * Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest." *In re J.B.*, 8th Dist. Cuyahoga No. 98565, 2013-Ohio-1705, ¶ 80-81. Regarding the first prong of the analysis, the trial court stated in its journal entries,

> [p]ursuant to R.C. 2151.414(B)(1)(a) and (d), the Court finds by clear and convincing evidence that it is in the best interest of the child to

grant permanent custody to the agency that filed the motion for permanent custody and that the following apply: The child cannot be placed with either parent within a reasonable time or should not be placed with the parent. This factor is discussed as part of the (E) factors of R.C. 2151.414 below. The child has been in the temporary custody of CCDCFS for twelve or more months of a consecutive twenty-two-month period.

Journal entry Nos. 0915150361 and 09151550367 (Oct. 20, 2021).

{¶ 50} R.C. 2151.414(B)(1)(a) states in part:

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that * * * the following apply: The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 51} The trial court determined that T.H. and MK.C. could not be placed within a reasonable time or should not be placed with either parent because there is evidence that one or more factors in division (E) of R.C. 2151.141 exist:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In

determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties; and

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

Journal entry Nos. 0915150361 and 09151550367 (Oct. 20, 2021).

{¶ 52} Continuing to address the first prong of the analysis, the trial court stated in its journal entries:

The parents have failed to complete the case plan, and the mother's substance abuse is still a safety issue. The child is afraid of [Father], the mother's husband and father of two of the children in this case, and there was testimony that the mother continues to have a relationship with him. This child has been in custody for three years, and two extensions of temporary custody have already been granted.

Journal entry Nos. 0915150361 and 09151550367 (Oct. 20, 2021).

{¶ 53} We recognize that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). And the "'[p]ermanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case.""' *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, quoting *Hayes* at 48, quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Also, "'termination of the rights of a birth parent is an alternative of last resort.'" *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21, quoting *In re Wise*, 96 Ohio App.3d

619, 645 N.E.2d 812 (9th Dist.1994), citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979). However, as to the first prong of the analysis, we cannot state that the trial court erred when it determined by clear and convincing evidence the existence of the conditions set forth in R.C. 2151.414(B)(1)(a), as discussed above, that resulted in awarding permanent custody of T.H. and MK.C. to CCDCFS.

## 2. Best Interest of the Child

{¶ 54} The second prong of the analysis requires the trial court to determine that granting permanent custody to the agency is in the best interest of the child. In accordance with R.C. 2151.414(D)(1),

> [i]n determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-

two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

R.C. 2151.414(D)(1).

{¶ 55} Additionally, in its journal entries, the trial court stated:

While it was not argued in trial, the Court notes that pursuant to R.C. 2151.454(D)(2), "permanent custody is in the best interest of the child and the court shall commit the child to the permanent custody" of CCDCFS if all of the following apply:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

The Court finds that all the factors listed in 2151.414(D)(2) apply in this case.

Journal entry Nos. 0915150361 and 09151550367 (Oct. 20, 2021).

{¶ 56} In the trial court's journal entry regarding T.H., it stated:

The Guardian Ad Litem for the child recommends that permanent custody is in the best interest of the child. Counsel for the child states that the child does not wish to be reunified. The Court conducted an in-camera interview with the child. The GAL report and recommendation, the statements of the child's counsel, and the in-camera interview are perhaps the most significant factors in this Court's decision. * * * **IT IS THEREFORE ORDERED, that the order heretofore made committing the child to the temporary custody of the Cuyahoga County Division of Children and Family Services is terminated. The child is committed to the PERMANENT CUSTODY of the Cuyahoga County Division of Children and Family Services for the purposes of adoption**. * * *

Journal entry No. 0915150361 (Oct. 20, 2021).

{¶ 57} In the trial court's journal entry regarding MK.C., it stated:

The Guardian Ad Litem for the child recommends that permanent custody is in the best interest of the child. The Court conducted an in-camera interview with the child. * * * The Court finds that the child's continued residence in or return to the home [Mother] and [Father] will be contrary to the child's best interest. * * * **IT IS THEREFORE ORDERED, that the order heretofore made committing the child to the temporary custody of the Cuyahoga County Division of Children and Family Services is terminated. The child is committed to the PERMANENT CUSTODY of the Cuyahoga County Division of Children and Family Services for the purposes of adoption**. * * *

Journal entry No. 0915150367 (Oct. 20, 2021).

**{¶ 58}** Thus, after a thorough review of the record, we find that there is clear and convincing evidence supporting the determination to award permanent custody to CCDCFS, and that the trial court did not abuse its discretion by finding that the award is in the best interest of the children. Therefore, Mother's second assignment of error is overruled.

## IV. Legal Custody Orders

**{¶ 59}** In Mother's third assignment of error, she argues that the trial court erred in issuing legal custody orders regarding J.D., MI.D., MA.D., and MR.C. because CCDCFS failed to expend reasonable efforts to reunite the children with Mother.

**{¶ 60}** In reviewing a trial court's decision to award legal custody, an appellate court recognizes that

> "[a] trial court's decision concerning the allocation of parental rights and responsibilities rests within the sound discretion of the trial court. *In re A.M.S.*, 8th Dist. Cuyahoga No. 98384, 2012-Ohio-5078, ¶ 17, citing *In re D.J.R.*, 8th Dist. Cuyahoga No. 96792, 2012-Ohio-698. Specifically, the trial court's determination of what is in the best interest of the child will not be disturbed absent an abuse of discretion. *Drees v. Drees*, 3d Dist. Mercer No. 10-13-04, 2013-Ohio-5197, ¶ 20. An abuse of discretion suggests that the trial court's judgment is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Under this standard, an appellate court may not merely substitute its judgment for that of the trial court. *Id.*"

*In re M.B.*, 8th Dist. Cuyahoga No. 105168, 2017-Ohio-7481, ¶ 5, quoting *In re A.P.D.*, 8th Dist. Cuyahoga No. 100504, 2014-Ohio-1632, ¶ 10.

{¶ 61} "'Although the statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, the [Ohio appellate courts] have previously held that the juvenile court must base such a decision on the best interest of the child.' (Citation omitted.)" *Id.* at ¶ 11, quoting *In re R.R.*, 9th Dist. Summit No. 23641, 2007-Ohio-4808, ¶ 12. "'In legal custody cases, trial courts should consider all factors relevant to the best interest of the child.'" *Id.*, quoting *In re S.J.*, 9th Dist. Summit No. 23199, 2006-Ohio-6381, ¶ 34. "'[T]he factors contained in R.C. 2151.414(D) may provide guidance to the trial court in making an award of legal custody.'" *Id.*, quoting *In re R.R.* at ¶ 12.

{¶ 62} In the trial court's journal entry for J.D., it stated:

> The Court finds by a preponderance of the evidence that it is in the best interest of the child to grant Legal Custody to * * *, Paternal Aunt. * * * The Guardian Ad Litem for the child recommends that Legal Custody is in the best interest of the child. Counsel for the child states that the child does not wish to be reunified. The Court conducted an in-camera interview with the child. The GAL report and recommendation, the statements of the child's counsel, and the in-camera interview are perhaps the most significant factors in this Court's decision. The parents have failed to complete the case plan, and the mother's substance abuse is still a safety issue. The child is afraid of [Father], the mother's husband, and there was testimony that the mother continues to have a relationship with him. This child has been in custody for three years, and two extensions of temporary custody have already been granted. The Court finds that the child's continued resident in or return to the home of [Mother] will be contrary to the child's best interest. The continued wardship of the child is not necessary and is not in the child's best interest.

Journal entry No. 0915150318 (Oct. 20, 2021).

{¶ 63} In the trial court's journal entry for MI.D., MA.C., and MR.C., it stated:

> The Court finds by a preponderance of the evidence that it is in the best interest of the child to grant Legal Custody to * * *, maternal grandparents. * * * The Guardian Ad Litem for the child recommends that Legal Custody is in the best interest of the child. Counsel for the child states that the child does not wish to be reunified. The Court conducted an in-camera interview with the child. The GAL report and recommendation, the statements of the child's counsel, and the in-camera interview are perhaps the most significant factors in this Court's decision. The parents have failed to complete the case plan, and the mother's substance abuse is still a safety issue. The child is afraid of [Father], the mother's husband and father of two of the children, and there was testimony that the mother continues to have a relationship with him. The child has been in custody for three years, and two extensions of temporary custody have already been granted. The Court finds that the child's continued resident in or return to the home of [Mother] will be contrary to the child's best interest. The continued wardship of the child is not necessary and is not in the child's best interest.

Journal entry Nos. 09515150320, 0915150322, and 0915150324 (Oct. 20, 2021).

{¶ 64} For all four children, the trial court noted that it considered the best interests of the children; the interaction and interrelationship of the children with the parents, siblings, and relatives; the wishes of the children; the custodial history of the children; and the children's need for a legally secure permanent placement. The trial court found that given Mother had not rectified her substance abuse issue, had failed to complete her case plan, and continued having Father in her home and life, it was in the best interest of the children to issue legal custody for the children.

{¶ 65} Therefore, we cannot say that the trial court erred in issuing an order of legal custody for the children.

## V.     Reunification

{¶ 66} "The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home." *In re R.D.W.*, 8th Dist. Cuyahoga No. 110661, 2021-Ohio-4304, ¶ 34, citing R.C. 2151.419. "'Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated.'" *Id.*, quoting *In re Evans*, 3d Dist. Allen No. 1-01-75, 2001 Ohio App. LEXIS 4809, 3 (Oct. 30, 2001). "To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification." *Id.*

{¶ 67} "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re R.D.W.* at ¶ 35, quoting *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95. "'"Reasonable efforts" does not mean all available efforts.'" *Id.*, quoting *In re J.B.*, 8th Dist. Cuyahoga No. 109039, 2020-Ohio-3675, ¶ 21, quoting *In re Lewis*, 4th Dist. Athens No. 03CA12, 2003-Ohio-5252, ¶ 16. "'Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.'" *Id.*, quoting *In re K.M.*, 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23.

{¶ 68} "''The issue is not whether [the agency] could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.'''' *Id.*, quoting *In re S.F.*, 2d Dist. Montgomery No. 25318, 2013-Ohio-508, ¶ 21, quoting *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096, ¶ 13. *See, e.g., In re K.W.*, 8th Dist. Cuyahoga No. 106700, 2018-Ohio-3314, ¶ 45 ("Whether an agency * * * made reasonable efforts pursuant to R.C. 2151.419 is based on the circumstances of each case, not whether there was anything more the agency could have done."). "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." *Id.*, quoting R.C. 2151.419(A)(1).

{¶ 69} R.C. 2151.419(A)(1) states:

(1) Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. If the agency removed the child from the home during an emergency in which the child could not safely remain at home and the agency did not have prior contact with the child, the court is not prohibited, solely because the agency did not make reasonable efforts during the emergency to prevent the removal of the child, from determining that the agency made those reasonable efforts. In determining whether reasonable efforts were made, the child's health and safety shall be paramount.

{¶ 70} The caseworkers assigned to the children testified that reasonable efforts were made to reunify Mother and the children. CCDCFS requested two six-month extensions after temporary custody was issued in order to give Mother time to rectify her issues. Mother continued to test positive for cocaine despite attending and completing substance abuse treatment. Mother tested positive for cocaine four days prior to the permanency hearing. Additionally, Mother did not remove Father from her home and continued to spend time with him, nor did she provide any documentation to support her assertion that she and Father were divorced or legally separated. Mother also had not addressed how the children were going to be adequately supervised while she was working. Finally, with exception of MK.C., none of the children wanted to be returned to Mother's care. Given the facts presented in this case, we cannot state that CCDCFS did not make reasonable efforts to reunite the children with Mother.

{¶ 71} Therefore, Mother's third assignment of error is overruled.

{¶ 72} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MICHELLE J. SHEEHAN, J., CONCUR